**THE MUNITIONS CARRIERS CONFERENCE, INC. and National Motor Freight Traffic Association, Appellees/Cross–Appellants**

v.

**UNITED STATES of America, et al., Appellants/Cross–Appellees**

**Nos. 97–5119 and 97–5240.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1998.

Decided July 28, 1998.

Edith S. Marshall, Assistant U.S. Attorney, argued the cause for appellants/cross-appellees, with whom Wilma A. Lewis, U.S. Attorney, Mary Lou Leary, U.S. Attorney at the time the briefs were filed, and R. Craig Lawrence and Benjamin R. Barnett, Assistant U.S. Attorneys, were on the briefs.

John R. Bagileo argued the cause for appellees/cross-appellants, with whom Claire Shapiro was on the briefs.

Before: EDWARDS, Chief Judge; WALD and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

After the Congress deregulated the motor carrier industry, the Military Traffic Management Command of the United States Army announced that it would begin soliciting competitive bids for the carriage of Foreign Military Sales (FMS) goods, which are military goods sold by the United States to foreign governments. The Munitions Carriers Conference and the National Motor Freight Traffic Association—trade associations comprising groups of carriers who transport FMS goods and general commodities for the MTMC—sued, arguing that deregulation had not eliminated the prohibition upon the Government's negotiating lower prices for the shipment of such goods. The district court agreed with the Carriers. We reverse, and hold that the MTMC is not prohibited from seeking competitive bids for the carriage of FMS goods.

## I. Background

Once upon a time the United States banned price competition among interstate motor carriers of freight. *See Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1152–54 (3rd Cir.1980) (describing institution of tariff regime for railroads in 1887 and its extension to motor carriers in 1935). Each carrier was required to file with the late Interstate Commerce Commission a tariff of its prices and conditions of carriage. *See* 49 U.S.C. § 10762(a)(1) (1994) (repealed 1995). The carrier could not charge a shipper any rate other than the rate in the filed tariff, *see* 49 U.S.C. § 10761(a) (1994) (repealed 1995), give any shipper "preferential treatment," *see* § 10735(a)(1), or discriminate "unreasonably" in its charges to similarly situated shippers, *see* § 10741(b) (1994) (repealed 1995).

From the outset the Government in its role as a shipper was exempt from this regime, so that any carrier could carry goods for the Government "free or at reduced rates." *See* 49 U.S.C. § 22 (1887) (now codified in revised form at 49 U.S.C. § 13712 (Supp. I 1995)); *Howe*, 622 F.2d at 1154 ("Congress intended to preserve the federal government's power to bargain with carriers, or to impose upon carriers preferential rates and terms—free of the antidiscrimination provisions of the Interstate Commerce Act, and free of regulation by the [ICC]"). When the railroads were facing severe financial problems in 1940, however—due in part to this government privilege, *see, e.g.*, S.Rep. No. 76–433, at 1–3 (1939); S.Rep. No. 79–522, at 7 (1945)—the Congress for the first time required the Government to pay "the full applicable commercial rate" for all transportation (whether by rail or by motor carrier) it procured. *See* 49 U.S.C. § 10721(a)(1) (1994) (repealed 1995). The Congress also revised § 22 to make clear that, notwithstanding the general prohibition of discrimination, a carrier could still voluntarily offer the Government transportation "at reduced rates." *See* 49 U.S.C. § 10721(b)(1) (1994) (now codified in revised form at 49 U.S.C. § 13712 (Supp. I 1995)). As of 1940, then, the Government could not require reduced rates but it could still negotiate them. In a further limitation, the Court of Claims held that the Government could

negotiate reduced rates only when the goods involved were transported "for the United States." *Baggett Transportation Co. v. United States,* 229 Ct.Cl. 428, 670 F.2d 1011 (Ct.Cl.1982) (adopting ICC holding that transport was not "for the United States" unless Government directly received all pecuniary benefit of reduced price). Under *Baggett,* the MTMC could not seek reduced rate transportation for shipments of FMS goods because the cost of shipping such goods is passed through to the foreign purchaser. *See id.*

In 1995 the Congress found that motor carriage had become a "mature, highly competitive industry where competition disciplines rates far better than tariff filing and regulatory intervention," and that rate regulation was no longer necessary except for "[two] specialized categories of trucking operations." S.Rep. No. 104–176, at 10 (1995) (referring to household goods and certain noncontiguous domestic trade, hereinafter collectively "household goods"); *see id.* at 43 (noting that "[f]or the two categories of traffic for which rates would be regulated, new [§] 13701(a) would import the basic rate reasonableness requirement"); *see also* 49 U.S.C. § 13701 (also imposing reasonableness requirement on "through routes," "divisions of joint rates," and rates "made collectively by [any group of] carriers under agreements approved" by the Surface Transportation Board). Therefore, the Congress abolished the ICC and repealed the provisions (1) requiring that a carrier file tariffs for all types of goods it transports; (2) prohibiting discrimination and preferential treatment; (3) prohibiting government requisition of reducedrate transport; and (4) permitting a carrier voluntarily to offer the Government reduced rates.

The Congress then enacted a new statutory scheme under which a carrier need file tariffs only for the transportation of household goods, as to which preferential treatment is still prohibited. *See* 49 U.S.C. ch. 137, § 13704(a)(2) (Supp. I 1995). At the same time, the Congress enacted a new version of the reduced-rate provision for government shipments. *See* 49 U.S.C. § 13712 (Supp. I 1995) ("A carrier providing trans-portation ... for the United States Government may transport property ... without charge or at a rate reduced from the applicable commercial rate.")

In the wake of this comprehensive deregulation, the MTMC decided that it could solicit competitive bids for transportation of FMS goods notwithstanding the *Baggett* decision. Seeking to realize the economies of scale that would be available if FMS and Department of Defense goods were transported together, the MTMC published a policy in December 1995 stating that a carrier wishing to transport FMS goods must make one bid for the transportation of DOD and FMS goods at the same price. *See Movement of Foreign Military Sales (FMS) Shipments—Policy Change,* 60 Fed.Reg. 64,031 (Dec. 13, 1995).

The two carriers' associations filed suit and the district court invalidated the policy upon both procedural and substantive grounds. *See Munitions Carriers Conference, Inc. v. United States,* 932 F.Supp. 334 (D.D.C.1996) (*Munitions I*). As to procedure, the court held that the MTMC had failed to comply with the requirement of a 60–day period for notice and comment before a new policy can take effect. *Id.* at 336–340; *see* 41 U.S.C. § 418b(a). Turning to the substance of the matter, the district court said that "there is still a two-level rate regime."

> The new statute codified at § 13712 still anticipates "discounted rates" for the government, and the rationale of *Baggett* requires that FMS rates not include this discount. To require carriers to submit one rate for these two types of shipments would either (1) contravene the holding of *Baggett* by giving foreign governments the benefit of discounted rates; or (2) render the statutory discount provision a nullity by preventing carriers from submitting discounted bids for any MTMC work.

*Id.* at 341.

After the district court's opinion issued the MTMC announced that in 60 days it would begin accepting bids for the transportation of FMS goods apart from DOD freight. Under the new policy, however, a carrier transporting FMS goods would have to follow the rules set forth in Military Freight Traffic Rules Publication No. 1A, whereas under the

former tariff regime the MTMC had had to accept the terms and conditions filed by each carrier as part of its tariff.· See *Movement of Foreign Military Sales Material Under Department of Defense Standard Tender of Freight Services MT Form 364–R—Policy Change,* 61 Fed.Reg. 58,679 (Nov. 18, 1996). The Carriers commented in response to this Notice that the requirement to abide by Publication 1A was unlawful under the substantive. ruling in *Munitions I.* The MTMC was not persuaded and it implemented the new policy as proposed.

The Carriers again sued. This time the same court granted summary judgment to the MTMC, holding that the system of separate competitive bids for FMS and DOD freight moving subject to the rules in Publication No. 1A did not conflict with *Munitions I. See Munitions Carriers Conference, Inc. v. United States,* Civ. No. 97–0595 (D.D.C. Aug. 1, 1997) (*Munitions II*). In case No. 97–5119 the MTMC appeals the substantive aspect of *Munitions I,* arguing that there is no two-level regime and that it is free to seek bids in the manner most convenient for it. In case No. 97–5240 the Carriers appeal *Munitions II.*

## II. Analysis

We hold that the district court erred in *Munitions I* in holding that there is still "a two-level rate regime" and upon that basis invalidating the MTMC's single-rate bidding scheme. The Carriers' appeal of *Munitions II* is therefore moot.

### A. *Munitions I*

■ Although the Carriers do not argue that the MTMC's appeal of the decision in *Munitions I* (invalidating its first policy) was mooted when the MTMC adopted the policy at issue in *Munitions II,* we must consider the question in order to be confident of our jurisdiction. *See, e.g., FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Floyd v. District of Columbia,* 129 F.3d 152, 155 (D.C.Cir.1997). Foreseeing this jurisdictional issue, the MTMC, after prevailing in *Munitions II,* republished its first policy in a Notice stating that, if upheld in its appeal of *Munitions I,* it

would reimpose that policy. *See Movement of Foreign Military Sales (FMS) Shipments—Proposed Policy Change,* 62 Fed. Reg. 58,946 (Oct. 31, 1997). That Notice keeps the validity of the first policy in contention and therefore keeps this matter a live controversy. And so to the merits.

■ The MTMC argues that by replacing the comprehensive tariff regime of Chapter 107 with the household goods regime of Chapter 137 the Congress intended to allow the market in all other motor carriage to operate freely; therefore, the MTMC may seek combined bids for the transportation of FMS and DOD freight just as any other buyer in a free market may solicit bids for the service it requires. The Carriers counter that § 13712 creates (or preserves) a two-tiered rate scheme in which discounts are still prohibited for FMS goods. In their view, combined bids must be prohibited because such bids would require a carrier either to give a discount for FMS goods, contrary to § 13712, or to give up its "right," pursuant to the same section, to offer a discount for DOD freight.

As the MTMC points out, there is a fundamental flaw in the Carriers' theory: it assumes that § 13712 applies to the transportation of all types of goods, as did § 10721 under the tariff regime. Chapter 107 made both tariffs and the requirements of nondiscrimination and nonpreferential treatment universal; § 10721 (the predecessor to § 13712) exempted all government transportation—and only government transportation—from the tariff requirement. Now that Chapter 137 imposes tariff and nonpreferential treatment requirements only upon the carriage of household goods, however, and eliminates any requirement of nondiscrimination, a carrier of non-household goods may offer any price to any shipper and negotiate different rates with different shippers. This is because § 13712 states only that a carrier "may transport property ... for the United States Government ... at a rate reduced from the applicable commercial rate." That is, nothing in § 13712 (or elsewhere in Chapter 137) prohibits a carrier from offering such discounted rates to others: the nondiscrimination provision (§ 10741(a)) was re-.

pealed; and the nonpreferential treatment requirement (§ 10735(a)(1)) was succeeded by a provision (§ 13704(a)(2)) that applies only to household goods.

Indeed, the Carriers concede that a carrier may negotiate rates with the Government as it does with other shippers. Nonetheless the Carriers maintain that the Government may not negotiate rates when it is acting on behalf of "a third party," such as a foreign government purchaser of FMS goods. The Carriers' argument is based upon the reference in § 13712 to "the applicable commercial rate": for every good there is a commercial rate, they say, and though a foreign shipper may on its own negotiate a reduction from that rate, the Government may not use its market power ("the threat of the loss of all freight moving under DOD tenders") to negotiate for such shippers because that would "force" a carrier to extend to a foreign government the benefit of the reduced rates that under *Baggett* were "previously given to DOD alone."

The Carriers' theory misconstrues both § 13712 and *Baggett.* In holding that the Government could negotiate rates only when the pecuniary benefit would go directly and wholly to the Government, *Baggett* was ensuring the integrity of the tariff rate, no-discrimination scheme under which carriers were prohibited from negotiating reduced rates for shippers other than the Government. In other words, *Baggett* prohibited discounts under § 10721 for non-government goods because the exemption in § 10721 was limited to government goods and at that time non-government shippers were forbidden to seek discounts. Now that the tariff scheme has been repealed, however, any shipper is free to seek a discount, as the Carriers concede. Any discount now obtained by the Government on behalf of a private shipper, therefore, would not be a "reduced" rate under § 13712 but would be simply a rate negotiated in the marketplace—and there is no indication that such negotiated discounts are prohibited.

The Carriers' theory that the statutory reference to "applicable commercial rates" somehow limits the MTMC's negotiating options is also ill-founded. There are today no known commercial rates other than the tariff rates filed for household goods. The only plausible way to read "applicable commercial rates," therefore, is as a reference to tariff rates for household goods. This reading is also consistent with the usage of the phrase elsewhere in the statute over time. Tariff rates were the only rates from 1887, when § 22 (the original version of § 13712) was enacted, until 1995; during that period the "applicable commercial rate[s]" were necessarily the tariff rates. In the current version of the statute, however, the Congress distinguishes between the "applicable commercial rate[s]" and unregulated rates set in the marketplace, which strongly suggests that the phrase "applicable commercial rate[s]" still refers to tariff rates (and perhaps to collectively determined rates, *see* 49 U.S.C. § 13703, a matter we need not decide in this case). For example, § 13710 states that a carrier must make available a copy of the rate "applicable to its shipment or agreed to between the shipper and carrier"; and § 13711 specifically addresses the difference—which could arise during the period of transition from regulation to the market—between the "applicable rate" and the "negotiated rate."

In addition, as the Government argues, there is no other intelligible way to read the phrase "applicable commercial rate[s]" because the statute gives no guidance on how to determine such rates if they are not understood to be tariff rates. Although the Carriers argue that their own internal price lists should be considered the applicable commercial rates, they offer no conventional legal argument to anchor this implausible theory either in the text or the structure of the statute. Tariffs were filed in a highly regulated environment overseen by the ICC; the tariff requirement was integral to the statutory purpose of ensuring that all rates were "just and reasonable" and not "unduly discriminatory." In today's unregulated marketplace, however, a carrier's internal price list has no legal significance whatsoever. The carrier may discriminate among different shippers; only the customer, not the Government, decides whether a price is reasonable; and "just"-ness has nothing to do

with the matter. To read "applicable commercial rate[s]" as the Carriers' own price lists, therefore, would be to read the Carriers' wish list into the law.

As explained in our discussion of *Baggett,* a negotiated rate—even if it is lower than the rates that others are able to negotiate—is not a "reduced" rate. This conclusion is consistent with the purpose of § 13712 and its predecessors, namely, to allow carriers to offer and the Government to accept discounted rates notwithstanding the general prohibition of discrimination among shippers under the tariff regime. The Government, not the carriers, has been the intended beneficiary of this provision in all prior versions. The Carriers' interpretation of § 13712, on the other hand, would benefit them and harm the Government by prohibiting the MTMC from using its market power to negotiate lower rates for the shipment of FMS goods. That the Congress intended thus to deny the Government and its FMS customers the benefit of lower negotiated rates while deregulating the motor freight industry and creating a free market for the benefit of all other shippers is, to say the least, counter-intuitive. More important, the suggestion remains completely unsupported.

The most reasonable way to interpret § 13712, then, is as the MTMC suggests: the provision exempts a carrier from the nondiscrimination provisions imposed by the rump tariff regime retained for household goods; therefore, the exemption being no broader than the rule, it too applies only to household goods moving under tariff rates. Deregulation removed the prior limitation under which only the Government could bargain with carriers. Because any shipper may now bargain for a lower rate, the Government may also bargain on behalf of non-government shippers. Neither *Baggett* nor § 13712 provides any reason to treat FMS goods differently from DOD goods, so there is no reason the MTMC cannot solicit bids in the form of one combined offer for the transportation of FMS and DOD freight. In sum, the policy announced in the 1995 Notice does not violate anything in Chapter 137.

B. *Munitions II*

The MTMC has stated that if it prevails in its appeal of *Munitions I*—as it now does—it will again implement the solicitation policy at issue in that case. *See* 62 Fed.Reg. 58,946. Because that policy will supersede the policy upheld by the district court in *Munitions II,* the Carriers' appeal of the latter case is now moot.

III. Conclusion

We reverse the judgment of the district court in *Munitions I* and hold that the MTMC policy at issue in that case is lawful. We dismiss as moot the appeal in *Munitions II.*

*So ordered.*