**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EMMERT INDUSTRIAL CORPORATION,
an Oregon corporation,
       *Plaintiff-Appellant,*

v.

ARTISAN ASSOCIATES, INC., a
Michigan corporation,
       *Defendant-Appellee.*

No. 05-35622

D.C. No.
CV-03-00782-AJB

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
July 12, 2007—Portland, Oregon

Filed August 13, 2007

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Goodwin

**COUNSEL**

Jeffry S. Garrett, Vicki L. Smith, Lane Powell PC, Portland, Oregon, for the plaintiff-appellant.

Frederick R. Damm, Clark Hill PLC, Detroit, Michigan, for the defendant-appellee.

**OPINION**

GOODWIN, Senior Circuit Judge:

Emmert Industrial Corporation ("Emmert") appeals a summary judgment in favor of Artisan Associates, Incorporated ("Artisan") on Emmert's three contract claims arising from the parties' agreement for the transportation of industrial metal-stamping presses and press components. We affirm in part, reverse in part, and remand to the district court for further proceedings.

## I.   FACTS AND PROCEEDINGS BELOW

An Oregon corporation, Emmert is an engineering and transportation company that specializes in transporting objects weighing in excess of 100,000 pounds. Artisan is a Michigan

corporation and transportation broker engaged primarily in coordinating complex "heavy haul" projects on behalf of its clients, a business in which Artisan routinely contracts with carriers such as Emmert.[1] In May 1996 Artisan, under a broker's contract with General Motors ("GM"), solicited bids for the "Press Project," a complex undertaking that involved the transportation and delivery of six industrial metal-stamping presses from Japan to GM plants in Georgia, Michigan, and Missouri. Emmert submitted the winning bid for transporting the major components of six presses, subsequently receiving a 46-word notification letter from Artisan stating that Emmert would serve as "the primary carrier" on the Press Project for transportation of "all components that weigh more than 100,000 pounds." Upon receipt of this letter, which also instructed Emmert to "proceed with the necessary planning," Emmert took a number of actions. Emmert sent employees to Japan to inspect the goods to be moved, surveyed port facilities, prepared a pre-moving analysis and route survey, and put together route plans for the Georgia phase of the project. Emmert assigned personnel and equipment to the Press Project, and paid a third party to monitor and detect "strain" on bridges over which loaded Emmert vehicles would pass.

Under Artisan's master operating agreement with GM, the "volume of business tendered to [Artisan] is contingent upon GM's requirements for such Heavy Haul, Rigging, and Flatbed services." Although GM retained control over the flow of work to Artisan in the first instance, once a move had been authorized, Artisan became primarily responsible for on-the-ground oversight and management. Specifically, the Artisan-GM contract provided that Artisan "is required to select and

---

[1]The term "broker" is statutorily defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

manage a network of certified and permitted carriers and rig-
gers . . . to meet the needs of GM," and that Artisan "shall
arrange transportation for GM, including the hiring of carriers
and riggers . . . ." The GM contract also provided that:

> Operational Control. [Artisan] shall have sole and
> exclusive control over the manner in which [Artisan]
> and its employes [sic] and/or sub-contractors per-
> form their Services. [Artisan] shall engage and
> employ and/or sub-contract with, such individuals or
> carriers as it may deem necessary in connection
> therewith. Such individuals shall be considered
> employes [sic] or sub-contractors of [Artisan] only
> and shall be subject to employment, discharge, disci-
> pline and control solely and exclusively by [Artisan].

Emmert completed two phases of the Press Project, trans-
porting and delivering press components to GM plants in
Georgia and Missouri, and invoiced Artisan approximately
$4.9 million for this work and for services in preparation for
a third project phase involving transportation to GM plants in
Michigan. However, before Emmert performed any further
Press Project work, GM reminded Artisan in writing that Arti-
san was scheduled to broker the move of another press in
early 1998, and requested a quote for this move "using carri-
ers other than Emmert." GM's logistics liaison also instructed
Artisan orally not to engage Emmert on any further Press
Project moves. At that point, the remaining Press Project
moves consisted of (1) parts of two presses to be moved to
Michigan; (2) one press to be moved to Missouri; and (3) var-
ious press component shipments.

On the same day it received GM's letter, Artisan notified
Emmert that Emmert did not receive the contract to transport
the remaining press parts to Michigan and Missouri, moves
that Artisan ultimately brokered through another carrier. Arti-
san also notified Emmert that Artisan did not receive the con-

tract from GM to broker the remaining component shipments, which GM eventually awarded to a different broker.

Artisan objected to numerous individual charges contained in the approximate $4.9 million claimed due by Emmert. After protracted negotiations, Artisan paid Emmert approximately $4.2 million and advised Emmert in October 1997 that it would make no further payments.

Emmert brought this action in June 2003. In its amended complaint Emmert (1) claimed that Artisan breached the contract by failing to pay the remaining balance; (2) attempted to state a claim in quantum meruit for the same amount; and (3) claimed that Artisan's failure to broker any further work to Emmert in the wake of GM's letter constituted an additional, independent breach of the contract. The district court granted Artisan's motion for summary judgment with respect to all three claims, reasoning that Emmert's first two claims were time-barred under the Interstate Commerce Commission Termination Act ("ICCTA"), and that because Emmert had no exclusive contractual right to handle the Press Project moves, Artisan did not breach the parties' contract by ceasing to funnel work to Emmert after July 31, 1997. Emmert now appeals, invoking our jurisdiction under 28 U.S.C. § 1291.

## II.  DISCUSSION

This is a diversity action in which none of Emmert's affirmative claims presents a federal question, and Emmert contends the district court erred on two grounds in concluding that its first two claims are barred by the ICCTA limitations period codified at 49 U.S.C. § 14705(a). Emmert first argues that the statute applies solely to a carrier's claims against a shipper for charges owed under a filed tariff. Because Emmert has no filed tariff, it asserts that § 14705(a) is inapplicable to its first two claims as a matter of law. Alternatively, Emmert contends that because the statute's substantive elements are not satisfied on the facts of this case, § 14705(a) cannot bar

its first two claims. Emmert also argues that the district court erred in dismissing its third claim for breach of contract. Each assignment of error is taken up below.

## Applicability and Operation of the ICCTA Limitations Period

[1] Emmert's contention that § 14705(a) is inapplicable to its first two claims as a matter of law was never argued or briefed in the district court. As Artisan correctly points out, we generally will not consider issues raised for the first time on appeal. *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004) (citation omitted). However, in our discretion we may consider an issue raised for the first time on appeal under several recognized circumstances, including where the issue presents a pure question of law that does not depend on the factual record developed below, or the relevant record is fully developed. *Id.*; *see also United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). This appeal fits comfortably within that exception. The question whether § 14705(a) applies solely to claims for charges owed under a filed tariff is purely one of law, resolution of which requires no further development of the factual record in this case. Further, notwithstanding Artisan's argument that it has been prejudiced by Emmert's failure to raise this issue below, this court has already determined that when, as here, an appellee has a full and fair opportunity to address an issue raised for the first time on appeal in its appellate briefing, there is no prejudice. *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004); *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). Because Emmert's argument to this court presents statutory interpretation questions of first impression, and because resolution of those questions is likely to broadly impact entities engaged in transporting goods in interstate commerce, we choose to address Emmert's argument.

Turning to the substance of this issue, there is no merit to Emmert's contention that the time limitation in § 14705(a)

applies only when a carrier seeks to recover charges owed under a filed tariff. Although neither this circuit nor any of our sister circuits appears to have directly addressed the issue, there are several reasons to reject Emmert's proposed construction of § 14705(a). Before evaluating those reasons, we briefly consider the broader statutory framework.

As originally enacted, the Interstate Commerce Act ("ICA") was a wide-ranging statutory scheme that imposed substantial regulations on the transportation of goods and persons between the states. *See Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 478 n.3 (2002); *Munitions Carriers Conference, Inc. v. United States*, 147 F.3d 1027, 1029-30 (D.C. Cir. 1998). The ICA contained a number of rate regulation provisions, including a requirement that most road carriers file tariffs defining the prices and terms under which they would transport persons and property. *See Munitions Carriers*, 147 F.3d at 1029-30. Enactment of the ICCTA in 1995 largely rolled back this pervasive scheme of federal regulation. *Id.* The new legislation deregulated most sectors of road transport, and relieved most road carriers of having to file tariffs describing their rates in detail. *Id.*[2] Despite the many changes implemented by the ICCTA, Congress retained the ICA's statute of limitations governing claims brought by carriers against shippers. *See* 49 U.S.C. § 14705(a). That statute lies at the heart of the district court's summary judgment on Emmert's first two claims, and in determining whether the statute should be construed as Emmert argues, we must begin "with the plain meaning of the statute's language." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 732 (9th Cir. 2007) (quoting *Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir. 2000)). The statute at issue in this appeal reads, in full:

---

[2]Road carriers still must file tariffs in two specialized categories of transportation: household goods and noncontiguous domestic trade. *Munitions Carriers*, 147 F.3d at 1029. Neither category is implicated by this appeal.

> A carrier providing transportation or service subject to jurisdiction under chapter 135 must begin a civil action to recover charges for transportation or service provided by the carrier within 18 months after the claim accrues.

49 U.S.C. § 14705(a).

"Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end." *Molski*, 481 F.3d at 732. (citations and internal quotation marks omitted). Additionally, where a statute is complete and unambiguous on its face, additional terms should not be read into the statute. *See Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 463 (1987). Finally, unless statutory terms are otherwise defined, they are "generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638, 643 (2006).

**[2]** As relevant to Emmert's tariff filing argument, the statute's plain language requires a carrier to bring a claim "to recover charges for transportation or service" within 18 months of the claim's accrual. Emmert, however, argues that "charges" should be read to mean "charges owed under a filed tariff." This contention is problematic for several reasons. First, there is no tariff requirement on the face of the statute. Because the statute is complete and unambiguous — a conclusion Emmert does not challenge — we will not read such a requirement into the statute. *See Burlington N. R.R.*, 481 U.S. at 463. Second, because the term "charges" is not statutorily defined, it should be interpreted according to its ordinary, everyday meaning. *Burton*, 127 S. Ct. at 643. The common meaning of "charges" does not necessarily relate to debt owed pursuant to a tariff, but also includes a price, cost, expense, or debt owed under contractual obligation. Simply, the plain and clear language of § 14705(a) includes no tariff

requirement, and Emmert presents no sound reason why we should construct one.

Emmert accurately points out that to determine the meaning of § 14705(a) we must consider the particular language at issue in context of the overall statutory scheme. *See McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (citation omitted). However, consideration of the broader legislative context belies Emmert's position. First, under basic principles of statutory interpretation, identical words used in different parts of the same statute are presumed to have the same meaning. *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). Other sections of the ICCTA use the term "charges" to refer to the price payable for transportation services provided by both carriers subject to a tariff requirement, *and* those who are not. *See, e.g.*, 49 U.S.C. § 13708 (describing billing and collection requirements for *all* carriers subject to jurisdiction under 49 U.S.C. § 13501, which includes carriers that must file a tariff, and those that need not). Accordingly, because the word "charges" as used in other sections of the ICCTA includes both tariff and non-tariff charges, the same meaning should apply to the word "charges" in § 14705(a).

A separate consideration of the broader statutory context bolsters our conclusion. The House Report on the ICCTA emphasized the need for consistent federal commercial rules "to ensure that all interstate transportation is subject to the same rules and procedures." H.R. Rep. No. 104-311, at 85 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 797. The intent to create uniform regulation is evident throughout the ICCTA, which establishes various requirements that apply equally to all carriers, including the limited class subject to the tariff requirement. *See, e.g.*, 49 U.S.C. §§ 13708 (billing and charge collection); 13707(a) (transfer of possession upon payment); 14101(a) (provision of safe and adequate service, equipment, and facilities). Given this clear intent to create a uniform regulatory scheme, we are not persuaded that Congress would,

*sub silentio*, simultaneously create different limitations periods for claims by tariff filing and non-tariff filing carriers.[3]

**[3]** Emmert's primary argument to the contrary — that no federal question jurisdiction exists over a carrier's claims absent a filed tariff, and therefore a filed tariff is necessary to invoke § 14705(a) — can be disposed of quickly. Simply, nothing in the text or context of § 14705(a) indicates that the eighteen-month limitations period is restricted to claims seeking charges under a filed tariff, or even to claims arising under federal law. We accordingly reject Emmert's proposed statutory construction, and conclude instead that because § 14705(a) applies to the first two claims in this "civil action to recover charges for transportation or service provided," Artisan may, as a matter of law, assert the statute's limitations period as an affirmative defense to Emmert's first two claims.

**[4]** We next consider whether § 14705(a) bars those claims on the facts of this case. As noted, § 14705(a) requires carriers subject to United States Code Title 49, Subtitle IV, Chapter 135 to bring an action to recover charges owed for transportation or service performed within eighteen months after the claim accrues. Emmert does not contest that it is subject to Chapter 135,[4] nor does it challenge the district court's conclusion that it is a "carrier" within the meaning of the ICCTA. Instead, Emmert contends that the district court erred in concluding that its first two claims are time-barred because at least some of the charges it seeks to recover are not for "transportation" within the meaning of the statute, because they are expenses relating to engineering, research, mobiliz-

---

[3]It is true that Congress intended some exceptions to a truly uniform regulatory scheme, as evidenced by the tariff filing requirement that applies only to "noncontiguous domestic trade" and "the movement of household goods." *See* 49 U.S.C. § 13702(a). We note, however, that while the ICCTA largely does away with the tariff requirement, it also requires non-tariff filing carriers, upon request, to disclose the same information contained in a filed tariff. *See* 49 U.S.C. 13710(a)(1).

[4]Nor can Emmert mount such a challenge. *See* 49 U.S.C. § 13501.

ing and demobilizing, stand-by time, and fees paid for engineering services provided by third parties.

The ICCTA defines "transportation" to include:

(A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

49 U.S.C. § 13102(23).

In light of this expansive statutory definition of "transportation," the district court concluded that the term encompasses all services rendered incident to the carriage and delivery of an item. And, despite Emmert's efforts to characterize the services at issue as engineering — or consulting — related, the district court determined that "they actually arise out of the transportation of goods." Accordingly, the district court concluded that Emmert's first two claims sought reimbursement for services governed by the ICCTA, and therefore determined those claims were untimely under the eighteen-month limitations period of § 14705(a).

[5] This circuit has never directly addressed this issue, and there is scant case law on point. However, the extant authority supports the district court's ruling. Considering the statutory predecessor to § 13102(23),[5] the First Circuit determined that

---

[5]Former 49 U.S.C. § 10102(26) was a near-verbatim forebear to § 13102(23). That definition of "transportation" was somewhat more restrictive, however, as it did not include the "arranging for" clause contained in current § 13102(23).

"transportation . . . includes all of a motor carrier's services incident to carriage and delivery." *PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 590 (1st Cir. 1988) (citations omitted). The Fifth Circuit reached a similar conclusion when construing former 49 U.S.C. § 1(3)(a), yet another statutory predecessor to current § 13102(23), which defined transportation as "all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported." *Centraal Stikstof Verkoopkantoor, N.V. v. Ala. State Docks Dep't*, 415 F.2d 452, 455-56 (5th Cir. 1969). Emphasizing the statute's breadth, the Fifth Circuit concluded that all "services rendered by a common carrier *in connection with* transportation of goods shall be covered by the Act." *Id.* at 456 (emphasis added). While the other circuits do not appear to have considered the reach of the term "transportation," the First and Fifth Circuits' reading of the statute is consistent with long-established Supreme Court jurisprudence. For example, considering an early statutory definition of "transportation" similar to current § 13102(23), the Court determined that Congress intended to define the term broadly enough so that a carrier's duty to the public "included the performance of a variety of services that, according to the theory of the common law, were separable from the carrier's service as carrier," and therefore defined the term so that "the entire body of such services should be included together under the single term 'transportation.' " *Cleveland, Cincinnati, Chi. & St. L. Ry. Co. v. Dettlebach*, 239 U.S. 588, 593-94 (1916); *see also S. Ry. Co. v. Reid*, 222 U.S. 424, 440 (1912).

**[6]** Taking the evidence in the light most favorable to Emmert, each of the services for which it seeks reimbursement — engineering, research, and operational costs — is directly related and incidental to the actual transportation of press components, and each was aimed at furthering that purpose. Although not every service directly involved the physical shipment of goods, each was undertaken specifically as a means toward that end. Given the expansive statutory defini-

tion of "transportation" in § 13102(23) we follow the broad construction our sister circuits have applied to similar definitions, and we conclude that the district court did not err by ruling that Emmert's services were at the very least undertaken while "arranging for" the carriage and delivery of the presses. Accordingly, the services for which Emmert seeks to recover charges constitute "transportation" within the meaning of the ICCTA, and § 14705(a) required that Emmert bring an action to recover any charges related to those activities within 18 months after the claim accrued, which is the date on which Emmert delivered, or tendered delivery, of the goods. 49 U.S.C. § 14705(g). Because Emmert last provided services for Artisan in May 1997, its eighteen-month window within which to seek relief had long since closed when it filed its complaint in June 2003, and § 14705(a) necessarily preempts any state law providing for a longer limitations period. *See Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1128 (9th Cir. 2005); *Cal. Fed. Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987). We hold that Emmert's first two claims are time-barred under 49 U.S.C. § 14705(a), and accordingly affirm the summary judgment granted to Artisan with respect to those two claims.

## Emmert's Third Claim

Emmert's third claim alleged an independent breach of contract arising from Artisan's refusal to award Emmert further Press Project work in the wake of GM's letter, and sought to recover both out-of-pocket expenses and lost profits related to carriage that Artisan brokered to other carriers.

As noted, the parties' short contract identifies Emmert as "the primary carrier" for Press Project moves "on all components that weigh more than 100,000 pounds." Considering the disputed "primary carrier" term, the district court looked to the dictionary meaning of the word "primary," which includes "first in order of time or development," and "of first rank, importance, or value." The district court concluded on that

basis that the parties' contract unambiguously contemplated Artisan's use of other carriers for the Press Project. Accordingly, it held that Artisan was within its rights to utilize other carriers, and granted summary judgment on this claim.

**[7]** We agree with the district court that the parties' contract did not expressly grant Emmert an exclusive right to Press Project moves. However, it is not clear precisely what rights Emmert was granted. The contract is ambiguous in that respect and summary judgment was not appropriate. Moreover, even if Emmert did not possess exclusive rights, it would not necessarily follow that Artisan did not breach Emmert's undisputed contractual right to serve as "the primary carrier" on certain Press Project moves when it refused altogether to broker further Press Project work to Emmert. The district court did not address this point. Nor did the district court determine what the parties intended by denominating Emmert as "the primary carrier" on certain Press Project moves, other than concluding, prematurely at the least, that the parties did not intend "primary" to mean "exclusive." Finally, the district court made no finding regarding the amount of work necessary for Emmert to perform to be considered "the primary carrier" on moves of components weighing in excess of 100,000 pounds. Because these material questions of fact regarding the nature and scope of the parties' agreement remain in dispute, summary judgment on Emmert's third claim was error. *See Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). We therefore reverse the summary judgment with respect to count three in Emmert's amended complaint, and remand that claim for further proceedings.

**AFFIRMED in part, REVERSED and REMANDED in part. Neither party to recover costs on this appeal.**